**J. H. PEPPER, Appellant,**

v.

**BANKERS LIFE AND CASUALTY
COMPANY, Appellee.**

No. 18748.

United States Court of Appeals
Eighth Circuit.

Jan. 4, 1968.

Bernard Whetstone, El Dorado, Ark.,
for appellant and filed brief.

Dennis L. Shackleford, of Shackleford
& Shackleford, El Dorado, Ark., for
appellee and filed brief.

Before VOGEL, Chief Judge, MAT-
THES and BLACKMUN, Circuit Judges.

VOGEL, Chief Judge.

This is an appeal from a judgment
based on a jury verdict, wherein J. H.
Pepper, appellant-paintiff, brought suit
against Bankers Life and Casualty Com-
pany, appellee-defendant. Diversity of
citizenship and the requisite amount jus-
tify federal court jurisdiction.

Appellee had issued its group accident
insurance policy to Dow Chemical Com-
pany at the latter's home office in Mid-
land, Michigan. The accident policy cov-
ered employees of Dow wherever they
were located. Dow and its subsidiaries
made payroll deductions for collection of
premiums on the policy from their vari-
ous employees. The policy contract pro-
vided in pertinent part that:

"The Company [Bankers Life and
Casualty Co.] agrees to pay indemnity
for loss suffered by the Insured Per-
son resulting from injury; to the ex-
tent herein provided.

" 'Injury' wherever used in this cer-
tificate means bodily injury causing
the loss, but only while the Master
Group Policy is in force, directly and
independently of all other causes and
effected solely through an accidental
bodily injury to the Insured Person.

"When injury to the Insured Person results in any of the following losses within Three Hundred and Sixty-five days after the date of the accident, the Company will pay for * * * Permanent Total Disablement . . . . . . The Principal Sum

" 'Permanent Total Disablement' shall mean Permanent Total Disablement which prevents the Insured Person from engaging in any occupation for which he is qualified by reason of training, education or experience, and payment cannot be made until the expiration of a period of twelve months from the date of the accident."

The case was tried before a jury which returned a verdict in favor of Bankers Life and Casualty Company and against J. H. Pepper. Pepper brought this appeal based upon three alleged errors as follows: (1) The court erred in not directing a verdict for the plaintiff; (2) the court erred in refusing to admonish the jury not to consider the gratuitous remarks of the witness Noble; (3) the court was in error in not granting the motion for a new trial on account of the misconduct of jurors C. M. Sizeland and Mrs. Paul Bennett. We affirm.

Appellant was a young married man, at the time under 28 years of age, with children, and employed as a cement worker, his duties being mostly outside operating a truck, and mixing and delivering wet cement. His duties caused him to be transferred to all parts of the country and he did work for Dow over a period of three or four years in Arkansas, Louisiana, Mississippi and, at the time of the alleged injury in November or December 1964, in Nevada. When first employed, appellant was required to take a physical examination and yearly thereafter examinations were made. The last such examination was at the Morgantown Clinic, Natchez, Mississippi, in March of 1964. The report was essentially negative, indicating that the appellant was in good health and physically fit for manual labor.

Actually, the appellant had a predisposition toward what is known as Raynaud's Phenomenon or Raynaud's Disease. Such predisposition renders those who have it susceptible to a manifestaton or flare-up or triggering of the symptoms common to Raynaud's Phenomenon if such person is exposed to either frostbite or extreme cold. Appellant was unaware of his predisposition to Raynaud's Phenomenon and apparently such predisposition is not susceptible to detection by medical examination.

In August 1964, appellant was transferred to Nevada. His duties there consisted of operating a huge cement truck. In mixing cement it was necessary for him to handle water. While he wore gloves, his hands were constantly wet. Part of the time he worked in high mountainous altitudes where he was exposed to low temperatures. During the last part of November or the first part of December 1964 the appellant began having trouble with his fingers. One of them became very sore and ached a great deal. He went to a doctor, who thought he had something like a "bone felon". He soaked his hands in Epsom salts, but obtained no relief. He was unable to sleep at nights because of the pain. By January 1965 calluses started to form on his finger ends. On February 10, 1965, the appellant went to see Dr. William R. Bentley in Las Vegas, Nevada. There for the first time Raynaud's Phenomenon was diagnosed. The appellant told Dr. Bentley that he was not able to work. Dr. Bentley was of a contrary opinion, stating that he was not disabled at all. He prescribed Priscoline and told the appellant to wear gloves and keep his hands warm and to stop smoking immediately. Appellant then returned to his outside job, but he obtained no relief as his hands were constantly exposed to water and cold. Ultimately the finger ends became gangrenous and began to smell badly.

C. W. Noble, manager of the Pacific Coast for Dow Chemical Company, noticed appellant wearing his gloves while they were having a coffee break in the office. He inquired as to the reason and was told. He called Dr. Bentley to verify

the information given him by the appellant and learned that the appellant was supposed to keep his hands warm and dry and that he was to stop smoking. Noble offered him a change of jobs which would put him in the bulk plant inside at least half the time in a heated building and where he would be dry all of the time. Appellant declined the offer, saying that he would prefer to stay on the cement truck. He also did not stop smoking. Appellant had a two-week vacation period due him. On March 12, 1965, he told Noble that he was going to take his vacation and go back to Arkansas to see his father-in-law, who was a medical doctor, and have him take a look at his hands. Appellant did not return to Nevada for work with Dow Chemical. His employment with Dow was terminated in April 1965. Noble expressed the opinion that he believed the appellant was physically capable of operating a bulk plant, handling dry materials, such work as Noble offered the appellant and which appellant refused.

Appellant admitted that he had placed a claim with the Nevada Industrial Commission based on "frostbite and radiation combined".

Dr. Eugene J. Towbin examined the appellant on behalf of the Bankers Life and Casualty Company in February and March of 1966. He testified in behalf of the appellee, confirming the diagnosis of Raynaud's Phenomenon. He stated, "It is my opinion that the Raynaud's Phenomenon seen in this young man heralds the development of some basic underlying systemic disease." He further added that he believed the appellant "would not have developed Raynaud's Phenomena if there were not some other propensity or disorder in his sympathetic nervous system and the vascular responsiveness." He stated that if the appellant exposes himself to cold or vibration which causes spasm he may again have gangrene set in at what is now the end of his fingers. He gave it as his opinion, "In estimating the degree and extent of Mr. Pepper's disability, I would say that it is quite clear that he will be unable to engage in any occupation which necessitates exposure to cold" and, "Often these people experience vascular spasm when exposed to vibration also and this would seemingly rule out his continued work as a heavy equipment operator, unless he were to move to a tropical or semitropical environment." He further testified:

"Q. Doctor, would you say now that in your opinion at this time and in the condition that he is in that he is disabled from performing his former occupation and you know what his former occupation was? Would you say that he is disabled from it?

"A. In terms of outdoor heavy work, I would think in his present condition that he could not perform without getting further lesions. He could perform it, but he would develop lesions if he were exposed to the cold again.

"Q. And that situation is permanent, isn't it?

"A. In most instances, once this phenomena becomes established, it is permanent. Occasionally, as the underlying disease—doctors say 'blossoms forth' and it is a heck of a term and you think of something nice, but then the Raynaud's Phenomena recedes. But more often than not, the Raynaud's Phenomena remains."

It is appellant's first contention that the trial court erred in not directing a verdict in his favor, claiming that there is no genuine issue of fact and that he was entitled to a judgment as a matter of law. We think the trial court very properly denied appellant's motion for a directed verdict and that it was entirely correct in submitting the case to the jury. Under the testimony of the various witnesses, it was for the jury to determine whether or not the appellant had suffered an accidental bodily injury directly and independently of all other causes which resulted in permanent, total disability which prevented him from engaging in any occupation

for which he was qualified by reason of training, education or experience. The burden to so establish rested with the appellant. Certainly, in view of the testimony the trial court could not say, as a matter of law, that the appellant suffered a loss effected solely through accidental bodily injury or that the injury resulted in permanent total disability. Here there were clearly factual issues for the jury to resolve. The record before us indicates that only appellant himself testified that he had suffered an accidental injury as a result of his exposure to cold while on his job in Nevada and that as a consequence of this injury he is permanently disabled. Dr. Bentley, who examined appellant on February 10, 1965, two months after appellant experienced trouble with his fingers, concluded that, " * * * I felt he was able to work and sent him back to work. He was not disabled at all." Furthermore, nothing in Dr. Bentley's statement suggested that appellant's condition was the result of an accident. Indeed, Dr. Towbin, an expert witness who appellant admitted was "eminently qualified", testified that appellant's condition resulted from a systemic disease rather than exposure to cold. These contradictions clearly indicate genuine factual issues for jury determination.

Contrary to our Rule 10(b), the appellant did not include in the printed record the complete instructions of the trial court to the jury. Apparently, however, no exceptions were taken by either side to the manner in which the trial court submitted the case to the jury nor to the issues which it pointed out were for their determination. Under the circumstances, the cases cited by both parties are neither helpful, clarifying nor determinative. All we have here are disputed issues of fact based on uncertain and contradicting evidence. Appellant's first claim of error is entirely without merit.

Appellant's second claim of error has to do with the testimony of the witness Noble. Noble was manager of the Pacific Coast of the United States and Alaska for Dow Chemical Company. He was the immediate superior of appellant Pepper. He was called in behalf of the appellee and testified as we have indicated, supra, that he offered to change the appellant's job to one where he could keep his hands warm and dry. During the cross-examination by appellant's attorney he was asked his opinion as to whether the appellant would have been able to perform the duties of the job offered him by the witness. His answer was, "I personally feel he could, yes." During the cross-examination, the following occurred:

"Q. Now, Mr. Pepper was persistent in that he tried not to make any complaint to you about his condition and, as a matter of fact, he more or less tried to conceal it and tried to go on and do his normal work as best he could and as long as he could, didn't he?

"A. He said this.

"Q. Sir?

"A. He said this.

"Q. Sir?

"A. He said this.

"Q. Well, I am asking you didn't he do that?

"A. I don't know whether the reason he didn't tell me was that he didn't want to complain or some other reason. I don't have any idea why he didn't tell me.

"Q. But he didn't come to you and complain and he did try to carry on his normal duties as long as he could and he didn't change his normal duties until you suggested that he do so, did he?

"A. Right. The reason I tried to get him to change was for his own good. Since there was no accident ever reported, I felt we should at least try to help him and see if he couldn't get better after his doctor had told me if he kept warm and dry he probably would be all right.

"Q. And you knew at the time he left that he was going to El Dorado for the purpose of consulting his father-in-law, who is a doctor, and to

try to get himself in position to get well and come back, didn't you?

"A. That is what he told me. He didn't come back and he also didn't return about a $200.00 expense advance that the company gave him.

"Q. Sir? What did you say?

"A. I say he didn't come back to work and he also didn't return a $200.-00 expense advance to by knowledge.

"Q. I don't remember asking you anything about that.

"A. That the company had given him.

"MR. WHETSTONE: [Appellant's attorney] If your Honor please, we ask that the Court instruct the jury to disregard this remark by this witness as not being responsive to the question and being highly prejudicial and about something that takes us completely by surprise and we ask the Court to instruct the jury to disregard it and to admonish the witness not to volunteer gratuitously statements of a prejudicial nature and about which he has not been asked.

"MR. SHACKLEFORD: [Appellee's attorney] May it please the Court, Mr. Whetstone opened that door just about as wide as it can be opened for that response, your Honor. He asked this witness if the man ever came back. Now, that was the question, and certainly the answer that he gave, if it was not responsive, then the man can't even answer the question.

"A. Well, the reason that I added it—

"THE COURT: Wait just a minute, Mr. Noble. Now, this is cross-examination and the jury has the duty to evaluate the testimony of the witnesses and you will answer his questions in the cross-examination as you feel, from the knowledge and the information you have, that you can respond, and it is the duty of the jury to consider and evaluate the testimony that you give. You may proceed, Mr. Whetstone.

"MR. WHETSTONE: Yes, sir, thank you, your Honor.

"A. I was trying to prove a point, if you will pardon me. The point that I was trying to prove was that had he [not] intended to come back, or had I not thought he was going to come back, we would have deducted this expense advance from the two weeks' pay that he had coming for his vacation. We didn't deduct it and he still didn't come back. That was the reason that I added that.

"Q. You didn't deduct it on the assumption that he was coming back and you took it for granted that he was going to come back at that point?

"A. Yes."

Appellant argues that the witness' reference to the $200 expense money advanced to the appellant by this employer was unresponsive, was prejudicial to him, and that the court erred in failing to instruct the jury as requested by counsel for the appellant. We think the answer of the witness Noble was not entirely unresponsive. Apparently Judge Harris thought likewise and exercised the discretion resting on him by explaining to the jury that this was cross-examination and the duty of the jury was to evaluate the testimony of the witnesses. In any event, the alleged error assumes de minimis proportion and is considered harmless.

Appellant's third and last claimed error involves the court's refusal to grant appellant's motion for a new trial based upon what he considers misconduct of jurors C. M. Sizeland and Mrs. Paul Bennett. At a carefully conducted hearing on the motion for new trial, Mrs. Bennett and Mr. Sizeland, as well as a number of other witnesses, testified at substantial length. It was the contention of the appellant that during the voir dire examination of the jurors certain facts were not disclosed which indicated prospective or actual bias or prejudice on the part of Mrs. Paul Bennett. In the examination, which was by the court, each prospective juror was required to stand and distinctly state his or her

name, residence and occupation. Mrs. Bennett, who later became foreman of the jury, stated:

"Mrs. Paul Bennett, Camden, Arkansas, part time office worker and mother."

She did not disclose that prospective juror C. M. Sizeland was her father, that the part-time office work which she did was in the Sizeland Motor Company, a Ford agency, and that she held some stock therein. Thereafter her father, C. M. Sizeland, was called and examined by the court. Among other things, he stated that he at one time had had a policy with Bankers Life and Casualty Company but that after he became seventy years of age he "cancelled out". Counsel for the appellant asked the court to inquire of Mr. Sizeland if he was then or had been for the past number of years the Ford dealer at Camden and if it was true that Bankers Life and Casualty Company was not the complete group insurer for all Ford agencies and if they had direct connection in that respect with Bankers Life and Casualty Company. Mr. Sizeland replied that his business had been "Selling Fords, but it is in the process of liquidation and we have never had any policies with the Bankers Life Insurance Company." No further questions were asked of Mr. Sizeland. Mrs. Bennett made no offer to disclose her connection with the Sizeland Motor Company. Eighteen jurors had been qualified by the court. Each party was to exercise its three peremptories. Among the three peremptory challenges made by the appellant was the prospective juror Sizeland. Mrs. Bennett was not stricken, remained on the jury and became its foreman.

A Mrs. Leo E. Ezell, who had never witnessed the trial of a lawsuit prior thereto, came to court and witnessed these entire proceedings. She was much interested in pending lawsuits brought by her husband, her son and her granddaughter involving damages for personal injuries arising out of an accident and in which an insurance company was involved. The claims of her son, her husband and her granddaughter had been denied by the insurance company. She testified at the hearing on the motion for a new trial that on the morning of the second day of the trial she heard Mrs. Bennett say in the ladies' restroom:

"She said, 'I didn't see no use of coming back today—the whole thing is a mess anyway, and I will be glad when it is finished'—something like that. Now, I don't say that is word for word, but I am tell [sic] you best I can, that it was all a mess and that she would be glad when it was over with and she could go home. I still didn't say anything."

In answer to the next question, she replied:

"A. She said, 'the whole thing is a mess anyway. I will be glad when it is finished so we can go home', said, 'there is nothing to this case anyway.' Then, I don't remember whether or not my daughter commented back. She was in there with me, and as far as to say, I don't know."

Mrs. Bennett testified that she did not make the statements attributed to her by Mrs. Ezell, although she may have complained about the fact that that morning the elevator was not working and she had had to climb stairs. She also testified that she did not know who worked for Bankers Life and Casualty Company and that when she, on request, gave a list of the employees of the Ford agency to one W. R. Rushing, she did not know he was local manager of the Bankers Life and Casualty Company nor what the list of employees with their addresses was for and that she was completely unaware of any connection between Bankers Life and Casualty Company and Ford dealers. It never occurred to her to offer information with reference to this and,

"I did not know what the list was for and to whom it was going, so I didn't see any point—I make a lot of lists."

After hearing all of the testimony in very substantial detail, the trial judge

made, inter alia, the following statements:

"The court is of the opinion that various claims of the plaintiff [are] completely without merit. The court at all times observed the conduct of the trial, the parties in the case, and the jury. The court observed no misconduct on the part of any one and indeed would not have tolerated such.

\* \* \* \* \* \*

"The contention of any prejudice or bias on the part of a member or members of the jury and alleged withholding of certain information was of serious import which required a hearing to develop the facts in an effort to ascertain the truth. Because of the seriousness of this contention, the court ordered the parties hereto and the witnesses for a full and complete hearing on Thursday, October 27th.

"From the hearing, argument of counsel, and the entire record, the court is constrained to hold that the case was submitted to the jury as a jury question under proper instructions. From a review of the record I am not convinced that any bias or prejudice [was] shown on the part of Mrs. Bennett. Neither do I feel from the record that any information on the part of Mrs. Bennett was withheld by the fact that she was a daughter of Juror Sizeland who was challenged by the plaintiff which denied any right the plaintiff had in selecting the jury.

"It was only these two questions that gave me any concern but in my mind [that] was cleared up by the testimony of witnesses on these questions.

"I am, therefore, constrained to deny the plaintiff's motion for a new trial and I am entering an order accordingly."

■ We are in complete accord with the trial judge's view of the claim of misconduct. Insofar as the single claim of dispute of fact was concerned, that is, the statement attributed to Mrs. Bennett by Mrs. Ezell and Mrs. Bennett's denial thereof, the trial court specifically determined that in favor of Mrs. Bennett and we must conclude that he had the right so to do. Appellant cites to us many cases where new trials have been granted because certain jurors, later selected to try the case, had incorrectly answered questions by the court on the voir dire examination or where, when asked the general question by the court, they had failed to disclose the fact that they or members of their family had been involved in or were about to be involved in claims or lawsuits respecting damages sustained in automobile accidents. That is not our situation here and the cases relied upon by the appellant are completely distinguishable. We find no error.

This case is in all things affirmed.